# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MARIA LOVELAND,          )
                       )
       Plaintiff,     )
                       )
vs.                  )    Case No. 4:09CV00899 AGF
                       )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                       )
       Defendant.    )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Maria Ann Loveland was not disabled and, thus, not entitled to supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be reversed and the case remanded for further consideration.

Plaintiff, who was born on September 2, 1963, filed for benefits on May 10, 2006, at the age of 42, alleging a disability onset date of June 1, 2004, due to degenerative disc disease with radiculopathy, and chronic alcoholism. After Plaintiff's application was denied at the initial administrative level, she requested a hearing before an Administrative Law Judge ("ALJ"), and such hearing was held on May 22, 2008. By decision dated

---

[1]    The undersigned originally had jurisdiction as a United States Magistrate Judge by consent of the parties under 28 U.S.C. § 636(c), but has since been appointed a United States District Judge.

August 29, 2008, the ALJ concluded that Plaintiff was under a mental disability due to

substance abuse, but that if she stopped the abuse, she had the mental and physical

residual functional capacity ("RFC") to perform her past work at a telemarketer.

Accordingly, the ALJ found that Plaintiff was not disabled under the Social Security Act.

Plaintiff's request for review by the Appeals Council of the Social Security

Administration was denied on April 14, 2009.  Plaintiff has thus exhausted all

administrative remedies and the ALJ's decision stands as the final agency action now

under review.

Plaintiff argues that the ALJ committed reversible error in (1) sending a letter to

Plaintiff's treating psychiatrist, William Wang, M.D., asking for clarification, without

showing the letter to Plaintiff; (2) finding that Plaintiff had an RFC for which there was

no medical evidence in the record; and (3) discounting the opinions of Dr. Wang and

another treating physician, Bradley Massey, D.O.

## BACKGROUND

### Work History and Application Forms

On a form submitted in connection with her application for benefits, Plaintiff

represented that she had worked "odd jobs" from 1992 to 2004, including as a secretary

at "some places," and most recently as a cashier.  In these jobs, she worked six hours per

day, five days per week, at a rate of $6.25 an hour.  She walked, stood, reached, typed,

and handled small objects five hours per day, and lifted and carried objects weighing less

than ten pounds.  (Tr. 103-04.)  The record indicates that Plaintiff also worked as a

cosmetologist, and as a telemarketer in 1996 and 1997.  (Tr. 25, 36, 44).

On her application forms, Plaintiff wrote that the conditions that limited her ability to work included lung cancer, asthma, bronchitis, alcoholic hepatitis, sleeping problems, anxiety, alcoholism, carpal tunnel, anemia, and reflux.  She indicated that these conditions interfered with her ability to breathe; and that she would get "winded" from walking to the mailbox and back.  She wrote that when her conditions began bothering her in 2001, she had to start carrying an inhaler, and that her boyfriend would pick her up from work whenever she had an asthma attack.  (Tr. 115.)

On a function report completed by Plaintiff's boyfriend, Stephen Vanderbos, on May 29, 2006, it was noted that Plaintiff lived in a mobile home with Mr. Vanderbos and Plaintiff's son.  Mr. Vanderbos indicated that Plaintiff's daily routine consisted of waking up, having some coffee, watching television, sporadically cleaning and doing laundry "with some help," and returning to bed.  Mr. Vanderbos wrote that Plaintiff did not drive because she had lost her license, that she enjoyed watching television and used to enjoy sewing, but that since having carpal tunnel surgery, could no longer do that.  He wrote that Plaintiff's memory and concentration were terrible, but that she could finish what she started, follow written and spoken instructions, and get along with authority figures.  (Tr. 124-30.)

**Medical Record**

In August 2005, Plaintiff was hospitalized for four days with alcohol withdrawal tremors.  It was reported that at that point, she had been abusing alcohol for

3

approximately 20 years.  The examining physician diagnosed her with "alcohol hepatitis," erosive esophagitis, and chronic obstructive pulmonary disease due to smoking two packages of cigarettes per day.  Plaintiff declined to participate in alcohol rehabilitation. (Tr. 190-222.)

On October 6, 2005, a nerve conduction study revealed that Plaintiff suffered from bilateral carpal tunnel syndrome.  (Tr. 324-26.)  On December 22, 2005, carpal tunnel release surgery was performed on Plaintiff's right hand.  (Tr. 378.)   On January 21, 2006, the surgeon expressed concern that Plaintiff was not wearing the wrist support that he had told her to wear.  (Tr. 373.)

On January 10, 2006, Plaintiff was admitted to the hospital following a suicide attempt by overdosing on alcohol and pills.  She was discharged later that day after agreeing with Dr. Wang to follow up for outpatient treatment.  Dr. Wang diagnosed Plaintiff with alcohol dependence, depressive disorder, and a Global Assessment of Functioning ("GAF") of 45.[2]  (Tr. 357-58.)  On February 24, 2006, carpal tunnel release surgery was performed on Plaintiff's left hand.  (Tr. 353.)

On August 10, 2006, at the request of the state disability determinations agency,

---

[2]    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

Plaintiff underwent a psychological consultative evaluation with Lois Lynn Mades, Ph.D. Plaintiff reported that she cared for her pets, washed dishes, kept a journal, watched television, and got along with others. Plaintiff said that she was stressed due to her son's legal problems. According to Dr. Mades, "it was not clear that Plaintiff was actually depressed."

Dr. Mades observed that Plaintiff maintained concentration, with appropriate persistence and pace. Plaintiff admitted that she used marijuana but "was generally not very forthcoming" with details. According to Dr. Mades, Plaintiff "smelled of alcohol" and it appeared that she was minimizing her alcohol use. Dr. Mades reported that she witnessed no evidence to support Plaintiff's complaints of memory loss, and observed no evidence of mood or thought disturbance or psychological impairment. Dr. Mades diagnosed Plaintiff with alcohol dependence, anxiolytic abuse (using drugs to treat symptoms of anxiety), opioid abuse, and a GAF of 70-75. (Tr. 414-19.)

On February 23, 2007, Plaintiff was admitted to a rehabilitation clinic for drug and alcohol treatment, as well as psychiatric care, for a 30-day stay. (Tr. 434-51.) On April 6, 2007, she obtained an MRI that revealed multilevel degenerative disc disease throughout the lumbar spine, and central disc extrusion at L4-5. (Tr. 629.) On April 11, 2007, an MRI of Plaintiff's right shoulder revealed osteoarthritis of the right acromioclavicular joint. The tendons of the rotator cuff were intact and there was no evidence of effusion. On April 26, 2007, a lower nerve conduction study revealed a right L5-S1 nerve root dysfunction. (Tr. 631-32). On June 28, 2007, Bradley Massey, D.O.,

referred Plaintiff to physical therapy for "low back pain with bilateral lower extremity symptoms, with herniated nucleus pulposus, L4-5." (Tr. 477-79.) Plaintiff was released by her physical therapist, Mary Walsh-Scott, after her eight prescribed visits on August 2, 2007. However, Dr. Massey authorized nine more visits, as Plaintiff's symptoms continued. (Tr. 453-69.)

On August 8, 2007, Dr. Massey completed a Physical Medical Source Statement ("MSS") regarding Plaintiff's functioning, which directed Dr. Massey to describe only the patient's limitations that would remain if the patient stopped using alcohol. Dr. Massey opined that during an eight-hour workday, Plaintiff could sit for four hours, stand for one hour, and walk for one hour. Dr. Massey diagnosed Plaintiff with chronic alcoholism and lumbar radiculopathy. He indicated that Plaintiff had no limitations in her hands and could frequently lift and carry ten pounds and occasionally lift and carry 20 pounds. (Tr. 707-10.)

An August 14, 2007 x-ray of Plaintiff's left foot showed hallux valgus (bunions) with mild degenerative changes. (Tr. 633.) Plaintiff was released from physical therapy for her low back pain and bilateral lower extremity symptoms after completing her prescribed course of nine visits on October 8, 2007, with only a "fair" response to treatment. (Tr. 453.) Dr. Massey then prescribed 13 more visits.

On an October 16, 2007 Physical MSS, Ms. Walsh-Scott opined that Plaintiff could sit, stand, and walk each for only 30 minutes during an eight-hour workday; could only occasionally lift ten or more pounds; could never stoop; could occasionally reach

above her head; and would require more than three breaks during an eight-hour workday. (Tr. 482-85.)

Plaintiff received lumbar epidural steroid injections for pain at a clinic monthly from July 2007 through April 2008, excluding December 2007 and January 2008. (Tr. 643-75, 683-704.) According to a report dated November 1, 2007, from Ms. Walsh-Scott to Dr. Massey, Plaintiff cancelled the last four of the 13 physical therapy visits prescribed by Dr. Massey, reporting that she was feeling better due to these lumbar injections. On October 15, 2007, surgeon Richard Gahn, M.D., diagnosed lumbar nerve root compression, lumbar disc displacement/herniation, and sciatica. (Tr. 588-90.) Following office visits on three occasions during this period (October 15, October 22, and November 7, 2007), Dr. Gahn noted that Plaintiff "has suffered from chronic disabling pain which has caused psychological, social and physical impairment." (Tr. 582-90.)

Meanwhile, on October 18, 2007, Plaintiff began receiving outpatient psychiatric care with Dr. Wang. He diagnosed depression, anxiety, alcohol abuse in early remission, and a GAF of 45. He noted that Plaintiff had not been drinking since February. This diagnosis continued through March 25, 2008, on which date Plaintiff admitted that she had had an "occasional drinking slip in sobriety." (Tr. 592-94.)

A mental MSS form filled out by Dr. Wang on March 25, 2008, instructed, "If your patient suffers from either drug addiction or alcoholism, please describe only the patient's limitations that would remain if the patient stopped using drugs or alcohol." On the MSS, Dr. Wang noted, in check-box format, that Plaintiff was markedly limited in her

7

ability to behave in an emotionally stable manner; maintain reliability, regular and timely attendance, and attention and concentration; and complete a normal work schedule without interruptions. Dr. Wang further concluded that Plaintiff was moderately limited in all other areas of mental functioning, such as being able to cope with normal work stress, function independently, and understand and remember simple instructions. According to Dr. Wang, Plaintiff was able to make simple work-related decisions, to understand, remember, and carry out simple instructions, and to respond appropriately to supervisors and co-workers. He further opined that the limitations he assessed had lasted for 12 continuous months. (Tr. 597-600.)

Dr. Massey's medical notes dated March 28, 2008, state that Plaintiff's low back pain was "a chronic problem, with essentially constant pain." Dr. Massey also noted that Plaintiff was a "current alcoholic and not in treatment." He wrote that Plaintiff's back examination revealed "full active and passive range of motion in flexion, extension, lateral flexion and rotation." (Tr. 624-25.)

**Evidentiary Hearing of May 22, 2008 (Tr. 22-48)**

Plaintiff testified that she was 45 years old and a high school graduate. She had worked as a telemarketer "in the past" and "did that pretty well" in 1996, her last year in the employment market. Plaintiff stated that she had not held any other job for over six months since then because, due to her back problem, she was unable to stand or sit for more than 15 minutes without pain shooting down her legs and her feet going numb. Plaintiff testified that she had been "in a wreck" 20 years ago and that her back had never

healed correctly. She stated that from 1996 to 2006, she had been a "stay at home mom."

Plaintiff testified that she had had a problem with alcohol in the past, but that it was no longer a problem. Since she graduated from the alcohol treatment center on March 23, 2007, she had one relapse in April 2007, and since then, had attended Alcoholics Anonymous ("AA") three times a week and had a sponsor.

Plaintiff testified that she had been in jail during the past year for failure to appear in court for driving on a suspended license, a violation of her probation. She explained that in 2007, she was placed on two years unsupervised probation and her license was suspended for five years for receiving two DWIs within a year and a half. Plaintiff testified that she smoked marijuana in 2006, but not since the end of that year.

Plaintiff testified that she was going to have surgery in June 2008 for her degenerative disk disease. She testified that she had seen Dr. Wang every three months since the end of 2006 for her depression. She stated that her depression started 20 years ago when she was in a car crash. After that accident, she lost custody of her first child, a daughter, to her ex-husband because she did not have the finances to fight for custody. She also lost custody of her first son, from her second marriage, to her mother-in-law. Plaintiff stated that both of her ex-husbands had been "extremely" physically abusive. Her mother left her when Plaintiff was two years old; Plaintiff found her when Plaintiff turned 15, but her mother disappeared again a year later.

Plaintiff also stated that her father recently passed away. All of these events,

Plaintiff explained, caused her to become depressed easily and to have panic attacks and anxiety.  The ALJ asked Plaintiff if she knew why Dr. Wang made a note on March 25, 2008, that Plaintiff was still drinking occasionally.  Plaintiff responded that she had told Dr. Wang that she had "had some wine" at a wedding.

Plaintiff testified that her back "just hurts."  If she sat or stood for ten to 15 minutes, it would begin to hurt her.  The pain was alleviated if she alternated sitting and standing, every 15 minutes.  Plaintiff stated that after the two surgeries for carpal tunnel, she was still having problems with her wrists – she could not hold anything for very long, if she tried to write with a pen, her hand went numb after a minute, and she could no longer cut hair.  The ALJ asked Plaintiff why the doctor who performed the wrist surgeries indicated concern that Plaintiff was not wearing the splint he had provided her.  Plaintiff responded that she wore the splint "when and where [she] could."

Plaintiff testified that besides depression and pain, she had no other problems that kept her from being capable of working full time.  She stated that cutting hair was her trade, but that she could no longer do it.  Nor could she go back to telemarketing because it required sitting.  She also could not perform a job in which she had to vary her position, because her back constantly hurt her, and if it accidentally popped out, she would have to go to the emergency room.  Plaintiff stated that she had been to the emergency room at least 20 times "in the last couple of years" for her back problems.

Upon examination by her counsel, Plaintiff testified that she could sit for 15 minutes, and then stand for 15 minutes, and repeat this cycle once more, but then she

would have to walk around to "get the cramps out," put Icy Hot on the "spot of the soreness," and take pain medication. Plaintiff stated that she applied Icy Hot each night to her lower back. On a typical day, she woke up at 7:00 to "get [her] son off to school," did the dishes, which took her a long time, since she did them "in increments," and then did laundry, which she did every other day, and which took her an hour and a half.

She also prepared meals, which took her 45 minutes because she had to sit down every ten to 15 minutes to take a break. She vacuumed twice a week, and mopped the kitchen three times a week, tasks she also could not do "all at once." She went to the grocery store with her boyfriend but he did all the shopping because she could not walk up and down the aisles with the shopping cart "for that long." She occasionally watched television, but mostly read. When her back "goes out," which occurred almost daily, she would read for 15 to 20 minutes until the nerve "unpinched."

After questioning Plaintiff about her past work, the VE testified that a hypothetical individual of Plaintiff's age, education, and experience, who could lift ten pounds occasionally, and less than ten pounds frequently; stand and walk for two hours and sit for six hours in an eight-hour workday, with a sit/stand option; occasionally stoop, kneel, crouch, and crawl; and understand, remember and carry out only simple instructions and non-detailed tasks would be able to perform Plaintiff's past telemarketing job. The VE stated that if the individual could sit for only four hours, stand for only one hour, walk for only one hour, occasionally lift 20 pounds and frequently lift ten pounds, occasionally stoop, and had no limitations in the ability to handle and work with small objects of both

hands, there would be no past work that Plaintiff performed or other work that the individual could do, because the total time for sitting, standing, and walking was less than eight hours.

Lastly, the VE stated that if a hypothetical individual's mental abilities were as described by Dr. Wang on his March 25, 2008 MSS, there would be no work the individual could perform.

## Evidence Obtained by the ALJ after the Hearing

On May 22, 2008, the ALJ sent letters to Drs. Massey and Wang asking them for clarification of their MSSs dated August 8, 2007, and March 28, 2008, respectively. The letter sent to Dr. Wang stated that clarification was sought because his MSS appeared to conflict with medical evidence of record, did "not fully assess the noncompliance [he] noted in [his] office note of March 25, 2008, and [Plaintiff's] continued consumption of alcohol," and did not adequately address what Plaintiff could do when alcohol was not a factor. (Tr. 83.)

Plaintiff asserts in her brief before this Court that the ALJ did not send Plaintiff or Plaintiff's counsel a copy of the letter sent to Dr. Massey. After receiving another copy of Plaintiff's medical records from Dr. Wang, the ALJ sent a copy of these records to Plaintiff's attorney. The ALJ received no response from Dr. Massey.

## ALJ's Decision of August 29, 2008 (Tr. 5-19)

The ALJ found that Plaintiff had the severe impairments of degenerative disc disease with radiculopathy and chronic alcoholism. He found that Plaintiff's chronic

alcoholism did not medically meet or equal the severity criteria of a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ stated, however, that due to symptoms associated with Plaintiff's chronic alcoholism, she would be unable to demonstrate the reliable attendance and adherence to a schedule needed to perform work, even at the sedentary exertional level.[3]

The ALJ noted that Dr. Wang's opinion expressed in the March 25, 2008 MSS was supposed to be based on what Plaintiff's abilities would be if she were abstinent from alcohol. The ALJ found, however, that Dr. Wang's notes showed that Plaintiff was having at least an occasional "slip" during the time frame he was treating her, and without any actual period when she was abstinent, it may have been difficult for him to separate Plaintiff's symptoms when sober versus when she was impaired due to over-consumption. The ALJ held, therefore, that since evidence demonstrated that the Plaintiff had no severe mental impairment absent alcohol abuse, Dr. Wang's opinion would be accorded "no weight" as it was inconsistent with the evidence as a whole.

The ALJ then found that if Plaintiff stopped the substance use, her mental limitations would not cause more than a minimal impact on her ability to perform basic work activities. In support of this conclusion, the ALJ stated that Dr. Mades' August

---

[3]     In 1996, the Social Security Act was amended to reflect changes in the award of benefits related to substance abuse. The statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C). See also Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010); 20 C.F.R. § 404.1535(b).

2006 evaluation did not diagnose any impairment other than those associated with substance abuse, and assessed a GAF of 70-75, indicative of no more than a slight impairment in social and occupational functioning. The ALJ also noted that Plaintiff did not receive treatment from a mental health specialist until she began seeing Dr. Wang in October 2007, which, according to the ALJ, suggested that Plaintiff had no severe mental symptoms apart from her substance abuse disorder.

In determining the extent to which any mental limitations would remain if the substance abuse were stopped, the ALJ considered the four functional areas set out in the Commissioner's regulations for evaluating mental disorders. The ALJ found that in the first functional area, activities of daily living, Plaintiff would have mild limitation; in the next functional area, social functioning, the Plaintiff would have no limitation; in the third functional area, concentration, persistence, and pace, the Plaintiff would have mild limitation; and in the fourth functional area, episodes of decompensation, Plaintiff would experience no such episodes. The ALJ found that because the remaining mental limitation would cause no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, they would be nonsevere if the substance use was stopped. Thus, the ALJ found that if Plaintiff stopped the substance use, she would not have a mental impairment or combination of impairments that met or medically equaled any of the deemed-disabling impairments listed in the regulations.

The ALJ then found that if Plaintiff stopped the substance use, she would have the physical RFC to lift and/or carry up to 20 pounds occasionally, and up to ten pounds

frequently, as required to perform "light" work pursuant to the regulations. The ALJ also found that Plaintiff would require a sit/stand option; and would be unable to climb ladders, ropes, or scaffolds; would only be able to occasionally climb stairs or ramps, as well as stoop, kneel, crouch, or crawl; and would be unable to tolerate concentrated exposure to vibration and unprotected heights; but would be able to understand, remember, and carry out at least simple instructions and non-detailed tasks.

The ALJ found that the surgeries for carpal tunnel successfully addressed the problem, and that carpal tunnel was not a severe impairment. He found Plaintiff's allegation that she was limited by back pain only "partially credible," on the ground that those who examined Plaintiff, as well as comprehensive testing, did not identify an underlying basis for pain at the level of severity alleged.

Citing Ms. Walsh-Scott's note that Plaintiff cancelled the last four physical therapy visits in October 2007 because she was feeling better with her spinal injections, the ALJ stated that impairments which can be controlled by treatment or medication are not disabling.

The ALJ found that Dr. Massey's October 10, 2007 examination notes did not suggest an individual who would be precluded from working. The ALJ also found that other impairments, including osteoarthritis, lung cancer, asthma, bronchitis, and alcoholic hepatitis, were not severe impairments because they were not indicated on Plaintiff's application for benefits or had not been treated on any ongoing basis.

The ALJ found that Plaintiff's daily activities provided evidence that she was

capable of functioning at a level that would not preclude sustained work activity. The ALJ also found that Plaintiff's "extremely low or non-existent" earnings over the years did not support the proposition that, but for her alleged impairments, she would be working, and that such a scenario could motivate Plaintiff to exaggerate her symptoms.

The ALJ accorded "no weight" to Dr. Massey's August 8, 2007, opinion regarding Plaintiff's physical limitations on the ground that it was inconsistent with Dr. Massey's own findings and with other evidence, and that issues such as a claimant's RFC, whether she is disabled or unable to work, or whether her impairment meets or is equivalent to a listed impairment, are reserved to the ALJ.

Based on the VE's testimony, the ALJ found that if Plaintiff stopped the substance use, she would be able to perform past work as a telemarketer. He thus found that Plaintiff's substance abuse disorder was a contributing factor material to the determination of disability, and concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the date of her application through the date of his decision.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted).

16

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors. See Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010).

**Failure to Provide Plaintiff with a Copy of the Letter to Dr. Massey**

Plaintiff argues that the ALJ erred in rejecting Dr. Massey's opinion due to Dr. Massey's failure to respond to the clarification letter the ALJ sent him following the evidentiary hearing, because the ALJ failed to proffer the letter to Plaintiff, in violation of her due process rights and the Commissioner's procedures.

As Plaintiff states in her brief before this Court, due process requires that a Social Security claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports post-hearing. Coffin v. Sullivan, 895 F.2d 1206, 1212 (8th Cir. 1990). Similarly, Section I-2-7-1 of the Hearings, Appeals, and Litigation Law Manual (HALLEX) of the Social Security Administration's Office of Disability Adjudication and Review requires an ALJ to proffer post-hearing evidence that the ALJ proposes to admit into the record. The matter in question here, however, was the ALJ's letter to Dr. Massey, and not evidence related to Plaintiff's claim. Furthermore, the ALJ's decision does not reflect that the ALJ relied on Dr. Massey's lack of response in according no weight to his opinion of Plaintiff's abilities. Lastly, Plaintiff's argument that Dr. Massey was barred by law from responding to the ALJ's letter is without merit.

**ALJ's Physical RFC Determination**

Plaintiff further argues that the ALJ's physical RFC assessment is not supported by medical evidence in the record. Plaintiff points to the fact that Drs. Wang and Massey, as well as Ms. Walsh-Scott, all found Plaintiff to be significantly more limited than did the ALJ, and that no medical source supports the sitting, standing, walking, and lifting

18

abilities found by the ALJ.

A disability claimant's RFC is the most she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Id.</u> at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. <u>Id.</u> at 1023. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" <u>Id.</u> (quoting <u>Hutsell v. Massanari</u>, 259 F.3d 7, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

The absence of an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not, however, make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such

explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." Cox v. Astrue, 495 F.3d 614, 620 n.6 (2007); see also Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that substantial evidence supported the ALJ's conclusion that the claimant had the RFC to perform light work, and thus her past work, where medical records indicated that she suffered only mild degenerative changes in her back condition, even though the medical evidence was silent with regard to work-related restrictions such as the length of time she could sit, stand, and walk; as it was the claimant's burden to prove at step four that she could not perform her past relevant work, her "failure to provide medical evidence with this information should not be held against the ALJ when there is medical evidence that supports the ALJ's decision").

Here, the ALJ's physical RFC assessment does not include an assessment of Plaintiff's abilities with regard to standing, walking, and sitting, other than that a sit/stand option would be required. The ALJ ultimately determined that Plaintiff could perform her past work as a telemarketer, based on the VE's testimony that an individual of Plaintiff's age, education, and experience, who had the physical RFC to lift ten pounds occasionally, and less than ten pounds frequently; stand and walk for two hours and sit for six hours in an eight-hour workday, with a sit/stand option; and occasionally stoop, kneel, crouch, and crawl, would be able to perform Plaintiff's past telemarketing job, from a physical standpoint. The Court concludes that this physical RFC is not supported by the record.

Most significantly, no medical source opined that Plaintiff could sit for six hours in an eight-hour workday, even with a sit/stand option.

Nor does the Court find any medical evidence from which the ALJ could have ascertained that Plaintiff had the standing, walking, and sitting abilities needed to perform her job as a telemarketer. Therefore, even assuming that the ALJ was entitled to discredit the opinions of Dr. Massey and Ms. Walsh-Scott, the ALJ's decision must be reversed and the case remanded for further consideration, which may require supplementation with the opinion of a medical examiner as to Plaintiff's physical work-related abilities. See, e.g., Wilcutts v. Apfel, 143 F.3d 1134 (ordering that case be remanded for supplementation of the record with the opinion of a mental health professional regarding the Plaintiff's work-related abilities).

**ALJ's Mental RFC Determination**

Plaintiff also contends that the ALJ committed reversible error by according the March 25, 2008 mental MSS of Dr. Wang no weight. Generally, the ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d

1010, 1013 (8th Cir. 2000) (citations omitted).

The Court finds troubling the ALJ's assumption that Dr. Wang did not follow the instruction on the MSS form that he should describe only Plaintiff's limitations that would remain if she stopped using drugs and alcohol. Nevertheless, the ALJ's conclusion that Plaintiff's mental impairments were directly linked to her substance abuse is supported by Dr. Mades' August 2006 evaluation that did not diagnose any impairment other than those associated with substance abuse.

When the opinion of a one-time consultant is at odds with a treating physician's opinion, "the ALJ must resolve the conflict between those opinions." Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (citing Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995)). The ALJ may discount or even disregard the opinion of a treating physician where other medical assessments, including those by consulting physicians, are supported by better or more thorough medical evidence, or where a treating physician rendered inconsistent opinions that undermine the credibility of such opinions. Id.; accord Travis v. Astrue, 477 F.3d 1037, 1042 (8th 2007).

Here, the Court believes that it was within the ALJ's zone of choice to rely on Dr. Mades' quite thorough and detailed August 2006 evaluation rather than on Dr. Wang's check-box March 25, 2008 mental MSS. See Cantrell, 231 F.3d at 1107 (holding that the ALJ properly exercised his discretion to favor the thorough reports of agency-funded, one-time consultants over the contrary check-box report of a treating physician).

Thus, if it is properly determined upon remand that Plaintiff has the physical

abilities to perform her past job as a telemarketer, the ALJ's conclusion that Plaintiff would be able to perform that job if she stopped the substance use is supported by the record. If the ALJ determines that Plaintiff cannot perform past work, the ALJ will have to proceed to step five of the evaluation process.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further consideration.

A separate Judgment shall accompany this Memorandum and Order.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 25th day of August, 2010.